

FILED

FEB - 9 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 09-27647-A-7 |
| | ) | |
| VOLODYMYR and SVETLANA DUBINSKY, | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| ASIATECH MANAGEMENT, LLC, | ) | Adv. No. 09-2488 |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| VOLODYMYR and SVETLANA DUBINSKY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM**

Plaintiff Asiatech Management, LLC, asks that its state court judgment for $129,234.57 be excepted from the chapter 7 discharge of defendants Volodymyr and Svetlana Dubinsky. That judgment is against Volodmyr Dubinsky ("the defendant") only and is based on his guarantee of a sublease entered into by plaintiff, the sublessor, and Advance Technology Office, LLC, ("ATO") the sublessee. The plaintiff alleges that in order to induce it to enter into the sublease, the defendant gave it a materially false financial statement. See 11 U.S.C. §

523(a)(2)(B).

At trial, the plaintiff voluntarily dismissed Svetlana Dubinsky.

28 U.S.C. §§ 157 and 1334 give this court subject matter jurisdiction to determine this core proceeding.  See 28 U.S.C. § 157(b)(2)(A), (I), and (O).

For the reasons explained below, the court agrees that the state court judgment cannot be discharged by the defendant.

I

The plaintiff leased commercial real property located in Santa Clara, California.  No longer needing this property for its own business, the plaintiff decided to sublet it.

With the assistance of a real estate broker, the plaintiff located ATO in January 2007 as a potential sublessee for a seventeen-month term commencing on February 1, 2007 and ending on June 29, 2008.  The defendant was the president of ATO.

ATO was a new company formed to develop a product which would display video on Apple iPods.  ATO's management included a former senior executive from Apple.  ATO had approximately 20 equity investors, including the defendant.

In the negotiations between each party's real estate broker, the plaintiff demanded, given the recent formation of ATO, that the defendant guarantee ATO's performance of the sublease.  To that end, the plaintiff's broker asked for the defendant's personal financial statement to evaluate his ability to make good on the sublease should ATO default.  Because there was another entity negotiating with the plaintiff for the sublease, the

-2-

plaintiff wanted to select the sublessee most likely to perform
the sublease's financial obligations.

Coincidentally, in November 2006 the defendant had prepared
a personal financial statement in connection with an application
for a loan from Bank of America.  He offered this statement to
the plaintiff.

That financial statement was very impressive.  Of prime
importance to the plaintiff and its broker, it showed that the
defendant had bank deposits approaching $1.7 million, marketable
securities of over $300,000, a gross salary of $720,000, gross
rental income of $420,000, dividend income of $420,000, and
interest income of $184,000.  In short, the defendant had about
$2.0 million in deposits and securities and gross income from all
sources of more than $1.7 million.  On the expense side, the
defendant's financial statement reported approximately $1.0
million in annual expenses.

While the financial statement also reported more than $36
million in real estate and interests in various businesses and a
$28 million net worth, it was the defendant's liquid assets
(approximately $1.7 million) and his income (approximately $1.7
million and $700,000 after all annual expenses) that convinced
the plaintiff to go forward with the sublease to ATO.

The parties signed the sublease at the end of January 2007.
It required a monthly rent payment of $8,299.20.  The February
rent and a deposit were paid by ATO as was the March rent.

ATO's business then failed, apparently because Apple began
selling iPods with native video capabilities.  ATO paid nothing
further and the defendant ignored the plaintiff's demands that he

-3-

1  honor his guarantee.  When the premises were not voluntarily
2  surrendered, the plaintiff evicted ATO.

3      The plaintiff then filed suit in Santa Clara Superior Court
4  to collect on the defendant's guarantee of the sublease.  The
5  defendant answered the complaint but failed to appear for trial.
6  In July 2008, the state court entered its judgment for
7  $129,234.57 in favor of the plaintiff against both ATO and the
8  defendant.  In its attempt to enforce the judgment, it recovered
9  only $2,465.23 from the defendant's bank accounts.

10     The defendant and his spouse then filed their chapter 7 case
11 on April 22, 2009.  Their bankruptcy schedules reported assets of
12 $1,338,964.47, liabilities of $15,791,575.58, and household
13 income of $9,000 a month.

14     In contrast to the bank deposits reported in the November
15 2006 financial statement, the bankruptcy schedules and statements
16 reported only approximately $10,000 in cash and bank deposits.[1]
17 As far as income, the defendant indicated that he and his wife
18 had income of just $136,807.08 in 2007, and $86,885 in 2008.[2]

19     The statements and schedules also reveal that the defendant
20 lost 15 real properties in foreclosure sales between June 2008
21 and March 2009.  And, the business interests listed as having a
22 value of almost $19.0 million on the financial statement are

23

24     [1] This total does not include approximately $100,000 in IRAs
25 and an IRC § 529 account.  None of these are listed as assets on
   the financial statement.

26

27     [2] These totals include all income for 2007 and 2008, whether
   from employment or other sources, reported in the answers to
   questions 1 and 2 of the statement of financial affairs filed for
28 both Mr. and Mrs. Dubinsky.

-4-

listed on Schedule B as having an "unknown" value.[3]

So, within 28 months of giving his financial statement to the plaintiff, the defendant's financial condition had taken a dramatic tumble – from a $28 million net worth and substantial liquidity, to a negative net worth and no net income above expenses.

Of course, his financial collapse does not necessarily mean that his financial statement was materially inaccurate when it was prepared or, if it was inaccurate, that the defendant knew it was inaccurate.

However, comparing the financial statement to the defendant's 2006 federal income tax return reveals that the former was not accurate in many particulars when it was prepared and when it was given to the plaintiff a short time later.[4]

First, the financial statement represented that the defendant and his spouse had salaries of $720,000. The tax return reported total salaries of only $396,875. But, if commission income of $68,160 and "supplemental income" of $216,124 received from one of the defendant's business interests, Trade House USA Inc., are added to the salary reported on the tax return, the defendant's household income rises to $681,159, only $40,000 less than he represented on his financial statement.[5]

_____

[3] A review of the docket reveals no attempt by the trustee to sell any of these interests and businesses, nor any motions by the debtors seeking to compel their abandonment.

[4] Perhaps for obvious reasons, the defendant has not asserted that his federal income tax return is inaccurate.

[5] See Form 1040, Statement 1, Miscellaneous Income, of the 2006 federal income tax return.

-5-

Second, the financial statement reported gross annual rental income of $408,000. The tax return, however, reported gross rents of only $79,514.[6]

Third, the financial statement reported dividend income of $420,000. The defendant's tax return, however, reported a $534,014 loss from the operation of the defendant's many businesses.[7] Even if this loss is off-set by the $1,985 in dividends from investments and a $53,067 short term gain from the sale of securities reported on the tax return, the defendant had nothing close to the dividend income he represented on his financial statement.[8] His businesses and investments netted him nothing in 2006.

Fourth, the financial statement represented that the defendant had annual interest income of $184,000 while his tax return for 2006 reported only $13,258 in interest income.

Finally, the defendant's tax return reveals one income source not mentioned on his financial statement. During 2006, the defendant had gambling income $682,062. Interestingly, according to the return, without this gambling income, the defendant and his spouse had net taxable income of just $19,533 rather than $701,595. In other words, without gambling income,

---

[6] See Schedule E, Part I, of the 2006 federal income tax return. In addition to this rental income, the defendant reported on Form 4797 of the 2006 federal income tax return an $89,734 gain from the sale of one real property.

[7] See Schedule E, Part II, of the 2006 federal income tax return.

[8] See Form 1040 and Schedule D, of the 2006 federal income tax return.

-6-

the defendant essentially had no net income in 2006.  That is
substantially different than the picture painted by the
defendant's financial statement which represents approximately
$1.0 million in net income, all of it from investments and
salaries.

The financial statement also was inaccurate with reference
to its representations regarding the defendant's bank accounts.
It refers to two accounts at Bank of America.  The first
reportedly had a balance of $224,026 on or about mid-November
2006, while the second had a balance of $1,462,734 as of that
same time.

As to the first account with a balance of $224,026, the bank
statement for the period November 1 through November 30, 2006
shows an ending balance of $402,931.60 and intermediate balances
as low as $117,834.29 and as high as $538,802.23.  However, on
November 14, the date the financial statement was signed, the
balance was $129,207.78, not $224,026.  Still, considering the
$183,476.46 beginning balance, the $402,931.60 ending balance,
and the significant amounts flowing in and out of the account,
the discrepancy between the account statement and the financial
statement is not significant.

However, the representation regarding the second account is
more problematic.  Even though the court received evidence of
three other accounts at Bank of America, and even though the
combined balance in these accounts as of November 14 was
$1,541,828.50, the three accounts did not belong to the defendant
or his spouse.  They belonged to a corporate entity in which the
defendant had an interest, Trade House USA, Inc., which did

-7-

business as VLD Realty. One of the accounts was a trust account
of some sort. The court received no convincing evidence that the
defendant had the use of these accounts for his personal benefit.
Nor did the court receive evidence that the defendant somehow
included the liabilities of Trade House USA, Inc., dba VLD
Realty, to counterbalance his use of its bank accounts on his
personal financial statement.

The one remaining liquid asset on the financial statement
totaled $303,778 and consisted of marketable securities. This
amount corresponds almost exactly with a security trading account
maintained by the defendant and his spouse at Scottrade. A
statement for the period October 1 through October 31, 2006 shows
a beginning balance of $303,778.68. The ending balance, however,
was substantially less, only $190,358.68.

The court concludes that the financial statement given by
the defendant to the plaintiff materially misstated his and his
spouse's incomes and their liquid assets.

The court does not believe the defendant's assertion that he
did not realize his financial statement was inaccurate when it
was given to the plaintiff. This assertion is not credible nor
plausible.

First, the magnitude of the discrepancies between his
financial statement and his tax return convince the court that he
must have known that his financial statement was not accurate,
both when it was prepared and when it was given to the plaintiff.

Second, the financial statement not only misrepresented
amounts, it misrepresented the defendant's ownership of bank
accounts (it included corporate accounts as personal accounts)

-8-

1 | and it omitted any reference to his gambling income.

2 |     Third, the defendant is an experienced and astute
3 | businessman.  He was an investor in many large businesses, he
4 | owned many rental properties, and he operated many other closely
5 | held businesses.  In short, he was business savvy and no stranger
6 | to credit transactions.  He knew his financial condition when he
7 | gave his financial statement to the plaintiff.

8 |

9 |     · II

10 |     The complaint asks that the plaintiff's state court judgment
11 | against the defendant be declared nondischargeable pursuant to
12 | section 523(a)(2)(B).

13 |     In order to obtain such a declaration, the plaintiff must
14 | prove by a preponderance of the evidence that the defendant
15 | incurred a debt by the use of a (1) written statement, (2) that
16 | was materially false, (3) respecting the defendant's financial
17 | condition, (4) that the defendant caused to be made or published
18 | with the intent to deceive the plaintiff, and (5) on which the
19 | plaintiff reasonably relied.

20 |     There is no dispute that the financial statement was a
21 | written document respecting the defendant's financial condition.
22 | There also is no dispute that the defendant authorized his agent
23 | to give the plaintiff the financial statement in connection with
24 | the negotiation of the sublease and a demand that the defendant
25 | guarantee ATO's financial performance of the sublease.

26 |     At trial, the defendant argued that the misrepresentations
27 | were not materially false and, if they were materially false, the
28 | plaintiff's reliance on the financial statement was not

-9-

1  reasonable.   The court rejects both arguments.

2       The defendant's trial brief correctly notes that it is not

3  enough to show that the financial statement is factually

4  incorrect.   See First Intertate Bank of Nevada v. Greene (In re

5  Greene), 96 B.R. 279, 283 (B.A.P. 9th Cir. 1989).   To be

6  materially false, the statement must "paint a substantially

7  untruthful picture of the financial condition by misrepresenting

8  information of the type which would normally effect the decision

9  to grant credit."   Id.

10      The defendant believes that his financial statement did not

11  materially misrepresent his overall financial condition.   While

12  the statement included bank accounts that did not belong to the

13  defendant or his spouse, substantially over-stated his household

14  income, and omitted any reference to gambling income, these

15  departures from the truth were immaterial given the defendant's

16  $39 million in total assets and $28 million net worth.

17      However, the plaintiff was seeking assurance that ATO or the

18  defendant would be able to pay timely a relatively modest amount

19  of rent (no more than approximately $141,086).   To than end, the

20  plaintiff's logical concern was with the defendant's liquidity -

21  his ability to timely pay should ATO be unable to do so.   The

22  misrepresentations in the financial statement went to the

23  defendant's liquidity.   The defendant's real estate holdings and

24  his interests in closely held businesses were less relevant and

25  helpful to ATO's quest for a tenant who was able to pay timely

26  rent than were the defendant's bank balances and incomes.

27      Viewed in this light, the financial statement was materially

28  inaccurate.   The financial statement represented that the

-10-

defendant and his spouse had $1.0 million in net income, all of
it from investments and salaries.  In fact, without the
undisclosed gambling income, he had virtually no income in 2006.
And, while the defendant did hold one bank account at Bank of
America with a balance of approximating the $224,026 represented
in the financial statement, his other liquid assets were not as
represented.  He was not the owner of the other Bank of America
account(s) with a balance of $1,462,734, and his securities
account had a balance of $190,358.68, not $303,778.  The
discrepancy, approximately $1.0 million, cannot be dismissed as
irrelevant for a debtor with no net income and annual expenses of
approximately $700,000.

Of course, the defendant did have other income in 2006.  He
won approximately $700,000 in his gambling pursuits but failed to
disclose that income.  This nondisclosure also was material.  It
is difficult to imagine that the plaintiff, looking for the
security of liquid and solvent guarantor, would have considered
the defendant a good risk if his solvency and liquidity hinged on
his card playing prowess.

Although not necessary to its conclusion that the financial
statement was materially false, the court adds that it does not
believe its representations regarding the value of the
defendant's other assets and his net worth.  As noted above,
within three months of giving the statement to the plaintiff, ATO
had defaulted on the lease and the defendant refused to honor his
guarantee.  This quick default was followed in short order by the
foreclosure of most of the defendant's rental properties, the

-11-

filing of 28 lawsuits against the defendant and his spouse,[9] and a 2009 chapter 7 petition that admitted to a negative net worth in the millions of dollars.

The court is convinced that the plaintiff actually relied on the financial statement when deciding to let the property to ATO.

Whether its reliance was reasonable must be judged in light of the totality of the circumstances of this case. See e.g., In re Cohn, 54 F.3d 1108 (3rd Cir. 1995). The court concludes that the plaintiff's reliance on the defendant's financial statement was reasonable.

First, the financial statement was one that had been presented to Bank of America in connection with the defendant's recent successful application for a loan. In other words, it had been given to a sophisticated lender in connection with a substantial loan which the defendant had used to acquire real property and make construction improvements. What better recommendation than the fact that a sophisticated lender like Bank of America had found the defendant creditworthy?

Second, as represented in the financial statement, the defendant's income and investments greatly exceeded the debt being guaranteed. Given this more than comfortable margin, the court cannot fault the plaintiff for not asking for further documentation of the defendant's finances.

---

[9] In response to Question 4a of the Statement of Financial Affairs, the defendant and his spouse listed 28 lawsuits in which they are named as defendants. Judging from the case numbers and the fact that the defendant reported that only two of these suits had been concluded when the chapter 7 petition was filed in 2009, these suits were filed between 2006 and 2009.

1    Finally, the court can discern nothing from the face of the

2  financial statement, or from the other facts made known to the

3  plaintiff when negotiating the sublease, that should have alerted

4  the plaintiff to further investigate the defendant's financial

5  condition.

6    The defendant also argued that he did not intentionally

7  deceive the plaintiff.  However, the magnitude the

8  misrepresentations concerning the defendant's income and liquid

9  assets, the almost immediate default under the sublease and the

10  defendant's failure to even attempt to honor his guarantee, the

11  defendant's financial deterioration immediately after giving his

12  guarantee, and the defendant's financial sophistication, all

13  convince the court that the defendant knew he was not being

14  truthful and that he intended to deceive the plaintiff.

15

16                         III

17    For the foregoing reasons, the court will enter a judgment

18  for the plaintiff.  As the prevailing party, the plaintiff will

19  recover its costs of suit and fees.[10]

20    A separate judgment will be entered.

21  Dated: *9 Feb. 2011*

22                              By the Court

23

24                              _____

25                              Michael S. McManus, Judge
                                United States Bankruptcy Court

26

27  _____

28    [10] The guarantee includes an attorneys' fee provision for
     legal services incurred in its enforcement.

                              -13-

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

CERTIFICATE OF MAILING

        The undersigned deputy clerk in the office of the United
States Bankruptcy Court for the Eastern District of California
hereby certifies that a copy of the document to which this
certificate is attached was mailed today to the following
entities at the addresses shown below or on the attached list.

Kenrick Young
52 Seraspi Ct
Sacramento, CA 95834

Volodymyr Dubinsky
144 Kettle Rock Ct
Folsom, CA 95630

Svetlana Dubinsky
144 Kettle Rock Ct
Folsom, CA 95630

Cheryl C. Rouse
345 Franklin St
San Francisco, CA 94102

DATED: 2/10/2011

By: *JoAnna Larson*
Deputy Clerk

EDC 3-070 (Rev. 6/28/10)